**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRANDY BRYARS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO 08-283-KD-B** |
| | ) | |
| **KIRBY'S SPECTRUM COLLISION, INC.** | ) | |
| **and JOHN KIRBY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (Docs. 36, 37, 38, 40), Plaintiff's Response in opposition (Docs. 41, 42) and Defendants' Reply thereto (Docs. 44, 45).   For the reasons set forth herein, the Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part as follows.

**I.     Background**

**A.     The Parties**

Plaintiff Brandy Bryars ("Plaintiff") is a former employee of Kirby Spectrum Collision. (Doc. 1).  Defendant Kirby Spectrum Collision, Inc. ("KSC") is an Alabama auto paint/collision corporation, located in Mobile, Alabama, which employs more than 15 regular employees.  (Id.) Individual Defendant John Kirby ("Kirby") is one of the principal owners, President and CEO of KSC.  (J.Kirby Aff. at ¶2).

**B.     Plaintiff's Employment at KSC**

Plaintiff was hired by KSC on September 5, 2006, as a Marketing Executive, to develop the "ACE" training program offered to insurance personnel with whom the company deals with daily, to provide service for its customers.  (Plf's Dep. at 33, 35-38; Marie Stringfellow ("Stringfellow")

Aff. at ¶6; J.Kirby Aff. at ¶6).  Plaintiff had no experience in marketing and/or sales prior to her employment and was provided on the job training during her employment with KSC.  (J.Kirby Aff. at ¶7).  Plaintiff's direct supervisors were Kirby and Stringfellow; she testified that she reported to Kirby on a day-to-day basis, as well as reported to manager Marie Stringfellow.  (Plf's Dep. at 35-37; Stringfellow Aff. at ¶7).

KSC's Employee Handbook ("Handbook") contains a written policy against sexual harassment in the workplace, and the Handbook is disseminated to all employees.  (Cheryl Kirby ("C.Kirby") Aff. at ¶5; David Kirby ("D.Kirby") Aff. at ¶5; J.Kirby Aff. at ¶5; Stringfellow Aff. at ¶5).  Plaintiff testified that she read a copy of KSC's Handbook, which Cheryl Kirby provided to her to review, and that she understood KSC's policies and procedures.  (Plf's Dep. at 33-35).  Plaintiff testified that while there was a copy of the Handbook at the office and she knew where it was located as well as that she could ask for a copy if she needed one, she did not actually ever receive a copy to take home until shortly before she quit.  (Id. at 34-35).  Plaintiff was aware and understood that she was to report any inappropriate conduct, such as sexual harassment, to her supervisor.  (Id. at 87, 93).  The Handbook provides, in relevant part, as follows:

> [t]hrough reasonable management, Spectrum Collision will endeavor to prevent any form of job harassment from occurring in our workplace.  Submission to unwelcome sexual advances, requests for sexual favors, and any other unbecoming verbal or physical conduct is not a condition of employment.  Neither submission to nor rejection of such conduct will be used as a basis for employment decisions.
>
> * * *
>
> Should you ever experience any job harassment problem, please exercise the steps in our company complaint procedure.  Or, at your option, you may directly contact any member of management in confidence, including the President/Vice-President. You may expect prompt and concerned reaction to your problem.
>
> * * *

(Doc. 38-2 at (1)-(2)).

Plaintiff testified that the atmosphere at KSC was "laid back to a certain extent" and that

everyone was pretty friendly with each other – half of the office was family and so it was common for people to hug each other within the office and there was a lot of touching and hugging amongst family members.  (Plf's Dep. at 41-42, 108-109).  KSC employees stated that John Kirby is an affectionate person and frequently exhibits warm physical gestures (touching, hugging, massaging shoulders) towards his employees – both male and female – which said employees did not consider to be sexual and/or inappropriate.  (Stringfellow Aff. at ¶¶4, 14-20; D.Kirby Aff. at ¶¶9,13-18; C.Kirby Aff. at ¶¶7, 9, 11; Curtis W. Gregg ("Gregg") Aff at ¶11, 16; Kenneth L. Crider ("Crider") Aff at ¶¶5-7, 16; Melissa Gaylord ("Gaylord") Aff. at ¶¶3, 6, 9-13; Dana P. Palladino ("Palladino") Aff. at ¶¶6-8; Brian Bates ("B.Bates") Aff. at ¶¶5-6 (see also Doc. 40-2 at ¶¶5-6); Robert Wayne Bates ("R.W.Bates") Aff. at ¶¶7-9).  Plaintiff testified that the only male employee that she saw Kirby hug was his son David Kirby.  (Plf's Dep. at 52, 55).

Plaintiff testified that while employed at KSC, she spent most of her time at her desk and worked in an open office environment with cubicles which provided no privacy between her desk and her co-workers.  (Plf's Dep. at 38-39, 41, 65).  Kirby worked in a glass enclosed office that he shared with his son, David Kirby, KSC Vice-President.  (Id. at 39-40; Stringfellow Aff. at ¶13).  Plaintiff testified that shortly after she was hired, Kirby "started getting a little close [in my personal space, touching, just real close] pretty quick[;]" "I mean standing right in my face or standing to where we're touching[--]" such as shoulders and hips touching.  (Plf's Dep. at 44-45). Plaintiff testified that Kirby hugged, touched (poked her stomach and rubbed her shoulders), kissed her as well as made comments to her that were inappropriate and that she let Kirby know that his actions (see below) made her feel uncomfortable by shrugging him off or to "wiggle off or step back or make noises like a sigh or just get a rude attitude[,]" would occasionally "give him a dirty look"

3

and/or act "real short with him." (Id. at 53-54, 66, 86).  Plaintiff testified that on several of the

occasions when she "shrugged him off," Kirby told her "we don't have to like each other but we're

going to have to get along somehow, and that I'm lucky to have my job[] and other people weren't

as fortunate," and that made her feel threatened.  (Id. at 68, 84-87, 129).  Plaintiff testified that she

did not ever tell Kirby specifically that his actions made her feel uncomfortable or that his words

or actions were offensive.  (Id. at 65-66, 81, 87).  Plaintiff testified that Kirby never told her or

indicated that if she did not acquiesce she would be terminated, but that "he acted like it." (Id. at

101-102).

Plaintiff testified that she told co-worker Melissa Gaylord that she "hated [Kirby] . . [f]or the

way he treated me[,]" that she "wanted to leave[,]" that she "did not like Kirby hugging her,"

"hat[ed] him being around me and on me and touching me and talking to me[]" and that she

"wish[ed] he would leave me alone[;]" however, Gaylord stated that she did not perceive Plaintiff's

complaint about Kirby to be a complaint of sexual harassment.  (Plf's Dep. at 87-92; Gaylord Aff.

at ¶¶8-9).[1]  Plaintiff testified that she also told Curtis Gregg, the KSC Production Manager, that she

"hated the way it was there" and told him that Kirby made her "uncomfortable;" Gregg stated that

he advised her to talk with Kirby, but he did not think that she was making a complaint of sexual

harassment.  (Plf's Dep. at 95-96; Gregg Aff. at ¶12-14).  Plaintiff testified that she told Curtis

Gregg, Melissa Gaylord and Byron White about being unhappy at work, that she hated Kirby being

"around her and on her and touching her" and that she "wished Kirby would leave her alone," but

did not explicitly tell them that she believed that Kirby was sexually harassing her.  (Plf's Dep. at

---

[1]  Plaintiff testified that she felt that Kirby was also inappropriate with Melissa Gaylord, with "the
hugs and kisses, the same stuff, but just not quite as bad."  (Plf's Dep. at 108-109).

87-92, 95-96).  Plaintiff testified that she understood that if she believed that she had been sexually harassed that she needed to report it to her supervisors, but that she did not ever make a formal complaint because "I didn't really feel like I had a proper outlet."  (Id. at 92-95, 97, 142).  Plaintiff testified that she did not report Kirby's conduct to family members David Kirby or Cheryl Kirby because "I would lose my job in a second."  (Id. at 94).  Plaintiff testified further, that she did not follow KSC's policies and procedures as set out in the Employee Handbook because she "felt uncomfortable and Mr. Kirby is very intimidating."  (Id. at 97).  Plaintiff also complains that KSC failed to give her a raise that she was entitled to receive after being employed by KSC for 90 days (December 2006).  (Id. at 99).

On February 7, 2007, Plaintiff notified Marie Stringfellow that she was leaving KSC, effective immediately, stating that "Kirby wants things his way" and that she "can't make [Kirby] happy."  (Plf's Dep. at 37, 110-112, 140).  Plaintiff testified that she also told Stringfellow that she "was humiliated" and "hoped to leave with some dignity" and then she left.  (Id. at 140).  Plaintiff testified that Kirby contacted her after she resigned to ask about the reason she resigned, and she refused to give him any reason.  (Id. at 141-142).  Plaintiff did not consider giving notice because she "could not stand the work environment."  (Id. at 111-112).  On February 12, 2007, Plaintiff began working for Austal at a higher rate of pay than at KSC.  (Id. at 110, 114).

On February 28, 2008, the EEOC issued a statutory right to sue letter, Dismissal and Notice of Rights, to Plaintiff.  (Doc. 1).  Plaintiff filed a timely charge of discrimination with the EEOC, alleging sex discrimination and retaliation, filed the present action within 90 days of receipt of the right to sue letter and has exhausted her administrative remedies.  (Id.)  According to John Kirby and Cheryl Kirby, KSC had no notice that Plaintiff had filed a sexual harassment claim until receiving

Plaintiff's April 6, 2007 Charge of Discrimination in May 2007 (J.Kirby Aff at ¶20; C.Kirby Aff. at ¶¶19-20), which set forth the "particulars" as follows:

> My name is Brandy Bryars. I was employed by the Respondent from approximately September 2006 until I was constructively terminated in or about February 2007. My job title was Business Development Manager. During my employment, the owner of the company, John Kirby, subjected me to unwelcome and inappropriate comments and behavior. For example, he repeatedly kissed and tried to kiss me all over my face and neck. He also walked up from behind me while I was working and massaged my shoulders. He would say, "If I was thirty years younger," and make comments about my breasts. Mr. Kirby did not conduct himself this way toward male employees. I complained to Curtis Gregg and Melissa Gaylord, who were members of management. I was intimidated by Mr. Kirby's strong personality, but I made it obvious that I was bothered by his physical advances. On days that I physically shrugged him off, he would make comments about how I should be glad I have my job. There were instances [h]e made comments that indicated my job was being threatened when I did not acquiesce to his physical contact. I was promised that I would receive a raise after ninety days, however, I did not get a raise. I believe that Mr. Kirby did not increase my pay because I did not positively respond to his over [sic] sexual behavior. I began looking for another job because I could not tolerate the sexual harassment. I believe that the Respondent violated my federally protected rights as secured by Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

(Doc. 38-8). In the Complaint, Plaintiff alleges that she was constructively discharged due to the failure of KSC to take remedial action to protect her from Kirby's actions and due to the hostile work environment. (Doc. 1).

1.  **Hugging**

Plaintiff testified that during the course of her employment, Kirby hugged her every day, sometimes once per day, sometimes more. (Plf's Dep. at 55, 57-58). Plaintiff testified that Kirby's "hugging" started when he introduced her to his family and other employees, stating that they had worked there for awhile and were like family too and so she would also be like family and "we could just all hug when we wanted to," but she told him that she "was not family." (Id. at 50). Plaintiff testified that a manager, Curtis Gregg ("Gregg"), saw her "trying to wiggle out[]" of one of Kirby's

6

hugs and that he looked at her shaking his head and asked her how she put up with it and that if he was a woman he did not know how he would put up with it either.  (Id. at 52-53).  Kirby hugged Plaintiff on other occasions in the presence of others including his wife and son.  (Id. at 55-57; C.Kirby Aff at ¶7; Gregg Aff at ¶11; Palladino Aff. at ¶13; D.Kirby Aff. at ¶9; Stringfellow Aff. at ¶16; Gaylord Aff. at ¶6).  David Kirby avers that he observed Plaintiff hug Kirby at least once and "she was the one who initiated the gesture[;]" and Melissa Gaylord avers that she "observed many occasions "where Bryars would return the affectionate gestures of Mr. Kirby including, but not limited to, hugging Mr. Kirby." (D.Kirby Aff. at ¶10; Gaylord Aff. at ¶7).  Plaintiff testified that when Kirby hugged her, he would on several occasions also "touch[] her stomach and waist," which she considered to be a "private" area on her body and that he once walked up to her and "poked" her on the stomach for a second.  (Plf's Dep. at 100-101).

### 2.  **Shoulder Rubbing**

Plaintiff testified that Kirby walked up behind her and rubbed her shoulders "a few times" when she was sitting at her desk and that she would "shrug him off."  (Plf's Dep. at 80-81, 130).  Plaintiff did not remember seeing Kirby rub any other employee's shoulders.  (Id. at 81).

### 3.  **Verbal Statements**

Plaintiff testified that Kirby would "always say something" to her – anything from how she is "a pretty girl," to what fabulous shape he used to be in when he was her age and that if he were younger he would call her all the time and take her out and buy her whatever she wanted, and "if he was younger . . . he would wear me out."  (Plf's Dep. at 59-63, 65, 99).  Kirby made the "pretty girl" comment maybe between five and ten times (that she was naturally pretty and did not have to wear a lot of makeup) and the "if he were younger" comments no more than five times.  (Id. at 60,

62-63).  Plaintiff testified that Kirby told her that "I better hurry up and get married[,]" which she thought was inappropriate.  (Id. at 103).  Plaintiff testified that Kirby made these comments in an open environment where other employees could hear and did not seem to be trying to hide his comments or actions toward Plaintiff and that they were said in a manner that other employees could see and hear.  (Id. at 64-65).  Plaintiff heard Kirby talking to other people about how when he was younger, he used to be in great shape.  (Id. at 60, 63).  Additionally, Plaintiff testified that Kirby also commented on breasts when her co-worker, Melissa Gaylord, tried on a Mardi Gras dress but the top did not fit; however, Plaintiff testified that she did not find the comment offensive or inappropriate.  (Id. at 81-82, 131).  Moreover, Plaintiff testified that one day when they were riding in a truck together, Kirby "blurted out that he didn't want me to be on birth control."  (Plf's Dep. at 58, 69-70).  Plaintiff testified about another day that they were driving in the truck together, asserting that she perceived that Kirby was mad because he was driving erratically: Kirby "got really mad and violent and almost got us in a wreck on Airport Boulevard; he jumped a median in his truck."  (Id. at 59, 66-69).  However, Kirby did not say anything to indicate that he was mad at Plaintiff.  (Id. at 68).  Plaintiff testified that she perceived Kirby to be mad because she had "shrugged him off," but Kirby never actually told that he was mad at her for rejecting his affections or for any other reason.  (Id. at 63, 66-67).

### 4. <u>Kissing</u>

Plaintiff testified that Kirby kissed her more than five times (usually on the head) and that "the worst one" occurred two months before she quit when "he was going for my mouth, and I jerked away, and I got slobber on my face . . . that's one of the days that I went home crying . . in the car."  (Plf's Dep. at 72-74, 76-77, 79, 130).

**C.**    <u>**Affidavits of KSC Co-Workers**</u>

Other employees at KSC, who were also employed during the time that Plaintiff was employed, include Robert Wayne Bates (Paint Technician), Melissa Gaylord (Parts and Supplies Clerk), Marie Stringfellow (Marketing Manager), Kenneth L. Crider (Paint and Body Technician), John Kirby (Defendant and President, CEO and one of the principal owners of KSC), David Kirby (Vice-President and co-owner of KSC), Dana P. Palladino (Paint and Body Technician), Curtis W. Gregg (Body Technician), Cheryl Kirby (Overseer of Payroll, Bookkeeping and Human Resources Departments) and Bryan Bates (Paint and Prep Technician). (Doc. 38 at Exs. 12-21). These employees' affidavits have been provided in support of Defendants' motion for summary judgment.

     **1.**    <u>**Robert Wayne Bates**</u>

In his affidavit, Bates stated that Kirby is a very affectionate man and will frequently pat him on the back, put his arm around his shoulder or give him a brief hug and one time, "Mr. Kirby hugged me so hard that it hurt me." (R.W.Bates Aff. at ¶7). Bates stated that Kirby is very affectionate with all of his employees and he "frequently observe[s] him placing his arm around them, hugging them, or touching them in an affectionate manner. Mr. Kirby treats all his employees in this manner regardless of whether they are male or female." (<u>Id</u>. at ¶8). Bates has never observed any behavior by Kirby that he considered to be sexual and/or inappropriate. (<u>Id</u>. at ¶9).

     **2.**    <u>**Melissa Gaylord**</u>

In her affidavit, Gaylord stated that Kirby is a very affectionate man who "frequently exhibits gentle embraces, pats on the back, and/or other acts of affection to his staff members, regardless of their gender." (Gaylord Aff. at ¶3). Gaylord stated that she worked with in the same office as Plaintiff for three months and observed Kirby hugging her on several occasions, but never observed

any behavior that she considered inappropriate or sexual in nature. (<u>Id</u>. at ¶6). Gaylord stated that she also observed many occasions where Plaintiff would return the affectionate gestures of Kirby including but not limited to hugging him and that on those occasions she did not appear to be shrugging him off or pulling back in any manner. (<u>Id</u>. at ¶7). Gaylord stated that one month before Plaintiff quit, she commented that she did not like Kirby hugging her but Gaylord did not report Plaintiff's complaint to anyone and did not perceive it to be a sexual harassment complaint. (<u>Id</u>. at ¶¶8-9). Gaylord stated that Kirby frequently hugs the staff, insurance adjusters and customers of the company with whom he is familiar and is affectionate with everyone without regard to anyone's gender as she has seen him hug both males and females on a frequent basis. (<u>Id</u>. at ¶9). Gaylord never considered that Plaintiff believed Kirby was sexually harassing her or making inappropriate advances. (<u>Id</u>. at ¶10). Gaylord stated that Kirby hugged her on numerous occasions, put his arm around her shoulder, and has given her an affectionate pat on the shoulder and/or back; she has always thought of his affection as nurturing and fatherly. (<u>Id</u>. at ¶ 11). Gaylord stated that Kirby has kissed her on several occasions on the crown of her head when she was upset or something was bothering her. (<u>Id</u>. at ¶ 12). She observed other staff display affection towards each other in a non-sexual manner: occasionally co-workers and/or Kirby will massage a co-worker's shoulders, usually prompted by a complaint of neck aches, headaches, backaches or stress. (<u>Id</u>. at ¶ 13). Gaylord stated that when she tried on a dress of Plaintiff's at work, she never saw Kirby and has no recollection of him commenting about the dress as it related to her. (<u>Id</u>. at ¶ 14).

### 3.   <u>Brian Bates</u>

In his affidavit, Paint and Prep Technician Brian Bates stated that Kirby is a very affectionate man who frequently pats him on the back, puts his arm around his shoulders or gives him a brief

hug, and that he is affectionate with all his employees and he has frequently observed him placing his arm around them or touching them in an affectionate manner. (B.Bates Aff. at ¶¶5-6) Bates stated that Kirby treats all his employees in this manner (male and female) and that he has never observed any behavior by Kirby that he considered to be sexual and/or inappropriate. (Id. at ¶6).

### 4. **Curtis Gregg**

In his affidavit, Body Technician Curtis Gregg stated that he observed Kirby hug and kiss Bryars on several occasions and thought nothing of the behavior because Kirby is very affectionate and frequently shows affection to employees (male and female) in that manner. (Gregg Aff. at ¶11). Gregg stated that in January 2007, Plaintiff told him that Kirby made her uncomfortable and in response he told her to talk to Kirby; she did not indicate why or allude to sexual harassment concerns and he did not consider this to be a complaint of sexual harassment or he would have immediately notified HR and/or David Kirby. (Id. at ¶¶12-14). Gregg said that he perceived her comment to mean only that "she didn't care for his [Kirby's] affectionate manner." (Id. at ¶13). Gregg stated that he has never observed inappropriate conduct between Kirby and Plaintiff, that she did not appear nervous or uncomfortable around him and that on one occasion, he observed her instigate a hug with Kirby. (Id. at ¶15). Gregg stated that he never observed Kirby act inappropriately and/or sexual toward any employee. (Id. at ¶16).

### 5. **Dana Palladino**

In her affidavit, Paint and Body Technician Dana P. Palladino stated that Kirby is very affectionate and frequently pats her on the back, puts his arm around her shoulder or gives her a brief hug. (Palladino Aff. at ¶6). Palladino stated that Kirby is very affectionate with all employees and she has frequently observed him placing his arm around them, hugging them or touching them in

an affectionate manner and that he treats all employees in this manner regardless of whether they are male or female. (Id. at ¶7). She has never observed any behavior by Kirby that she considered to be sexual and/or inappropriate. (Id. at ¶8). She observed Kirby hugging Plaintiff from the side on one occasion and that Kirby frequently hugs his employees (both male and female), and there did not appear to be anything inappropriate or sexual taking place. (Id. at ¶13). She did not recall observing Plaintiff appear uncomfortable around Kirby or attempt to avoid him. (Id. at ¶14).

**6.      Cheryl Kirby**

In her affidavit, overseer of Payroll, Bookkeeping and HR and Kirby's wife, Cheryl Kirby stated that she has observed Kirby hug Plaintiff on several occasions and never thought anything about his show of affection as he is affectionate with everyone (male and female) and exhibits this affectionate demeanor at work, church and social settings. (C.Kirby Aff. at ¶7). She never observed Plaintiff appear uncomfortable around Kirby or in his presence. (Id. at ¶8). She stated that Kirby is a very affectionate man and treats his employees like they are his children/family; he hugs everyone (male and female) and is very affectionate (frequently puts his arm around employees or touches them in an affectionate manner and treats all in this manner regardless of gender). (Id. at ¶11). She stated that she has never received any complaints about Kirby's affectionate behavior or received any indirect complaints that he was inappropriate or made anyone feel uncomfortable; if she had, she would have immediately taken action. (Id. at ¶12).

**7.      Kenneth Crider**

In his affidavit, Paint and Body Technician Kenneth L. Crider stated that it is not uncommon for Kirby to demonstrate a kind touch, hug or even kiss to his employees, regardless of gender. (Crider Aff. at ¶¶2, 5). Crider stated that Kirby has hugged him many times, kissed him on the

cheek and on top of the head, but that he has never been offended by Kirby's affectionate gestures and never perceived them to be sexual in nature. (Id. at ¶6). Crider observed Kirby show affection including but not limited to, a hug and/or kiss to other employees, both male and female, but has never observed any behavior that he considered inappropriate or sexual in nature. (Id. at ¶7). Crider stated that he never observed any behavior between Kirby and Plaintiff that he considered inappropriate. (Id. at ¶14). Crider stated that Plaintiff complained to him from time to time about her job as well as that she was not making enough money and was upset about not receiving a raise. (Id. at ¶15). Crider stated that Kirby is very affectionate with the employees and frequently puts his arm around them or touches them in an affectionate manner, regardless of gender. (Id. at ¶16).

### 8.   **Marie Stringfellow**

In her affidavit, Marketing Manager Marie Stringfellow stated that Kirby is affectionate with his employees and frequently touches and hugs both male and female employees and that she has never observed Kirby touch anyone in an inappropriate or sexual manner. (Stringfellow Aff. at ¶¶2, 4). Plaintiff was assigned to her direct supervision and reported directly to her on a day-to-day basis; she would provide information to her about daily appointments, work schedule, leave and employment related concerns (she talked to her daily and frequently inquired about problems Plaintiff may be experiencing at work). (Id. at ¶7). Stringfellow stated that Plaintiff frequently complained about her job (complaints about being accountable regarding her time out of the office, mileage logs and/or client contacts, stating that she wanted to do things differently than Kirby). (Id. at ¶8). Stringfellow advised Plaintiff that she was new and needed to prove to Kirby that she was capable of performing the job before she came in with changes in the way he ran his company. (Id.)

She never observed any conduct between Kirby and Plaintiff that indicated that Kirby was

engaged in inappropriate behavior and that it was her opinion that such behavior would not have gone unnoticed by the staff given the small office workspace.  (Id. at ¶14).  Stringfellow stated that given the family type environment at work, a kind touch or hand on the shoulder is not uncommon and staff members occasionally gently massage the shoulders of someone if they have had a bad day, complain of a headache or neckache or appear stressed and these occasional touches are not sexual in nature and are nothing more than expressions of affection among staff.  (Id. at ¶15).  She has observed Kirby hug Plaintiff and other employees (male and female) and observed Kirby kiss Plaintiff on the top of her head on one occasion (which was not sexual in nature and did not lead her to think that Kirby had engaged in inappropriate behavior).  (Stringfellow Aff. at ¶¶16-17).  Stringfellow stated that Kirby is frequently affectionate towards her and other employees including but not limited to a gentle touch, hug or fatherly kiss when she is having a bad day or is upset.  (Id. at ¶18).  She stated that she has never observed Kirby acting inappropriately towards her or any other employee, and that she has observed him be affectionate with almost every employee regardless of gender.  (Id. at ¶¶19-20).

Stringfellow stated that Plaintiff complained to her about her job on numerous occasions, but never complained to her that she felt she was being sexually harassed or that Kirby had acted inappropriately towards her.  (Id. at ¶¶21-22).  When Plaintiff resigned, she stated that her reason was that she already had a job with Austal Shipbuilding (a better position with more pay) and never mentioned that Kirby had sexually harassed her or that her resignation was related in any way to Kirby or any alleged inappropriate conduct.  (Id. at ¶¶25-26).

14

### 9.      **David Kirby**

In his affidavit, Vice-President and co-owner and son of Kirby, David Kirby stated that he has observed Kirby hug Plaintiff on several occasions and never thought anything about Kirby's show of affection towards her as he is affectionate with everyone (male and female).  (D.Kirby Aff. at ¶9).  He never observed Plaintiff appear uncomfortable around Kirby or observe her brush him off or show dislike to his affectionate manner; in fact, he observed her initiate a hug to him at least once.  (Id. at ¶10).  He stated that he talked with Kirby on several occasions about Plaintiff's work performance, as he was concerned that she was not performing her duties properly and only performing those duties she desired to perform which resulted in a large part of her duties being neglected; Kirby stated that he would talk with her.  (Id. at ¶11).  He observed Kirby talk to Plaintiff about her work deficiencies three weeks before she resigned and when she became upset, he apologized and reached over to pat her on the back, told her that he did not mean to upset her and kissed her on the top of her head.  (Id. at ¶12).  He did not consider the kiss to be inappropriate and/or sexual in nature.  (Id.)  He never observed any behavior between Kirby and Plaintiff that he considered inappropriate.  (Id. at ¶13).  He stated that Kirby is a very affectionate man who treats his employees like they are family and children – he hugs everyone, male and female, and frequently puts his arm around them or touches them in an affectionate manner, regardless of their gender. (D.Kirby Aff. at ¶¶14-15).

### 10.      **John Kirby**

In his affidavit, KSC President, CEO and co-owner John Kirby stated that he treats his employees like family and exhibits affection towards them; from time to time he will place his arm around an employee's shoulder, give them a gentle pat or hug, massage their shoulders if they have

had a bad day or headache, and these acts of affection are not sexual or gender specific.  (J.Kirby Aff. at ¶4).  Kirby stated that he has also, on occasion, kissed an employee in a fatherly and uplifting manner but these acts are never sexual in nature and are merely a demonstration of affection.  (Id.) Kirby stated that he did not recall any specific incident where he hugged Plaintiff but does not dispute that he may have occasionally hugged her as he does all his employees – but that he would have hugged her from the side, denying any act that could have been perceived as sexual in nature. (Id. at ¶9).  Kirby stated that he hugs each and every one of his employees, male and female, and is frequently affectionate with them and that it is not uncommon for him to place an arm around their shoulder, pat them on the back, give them a hug, or occasionally kiss them on the top of their head or cheek.  (Id. at ¶10).  Kirby stated that he had some difficulties with Plaintiff's work performance, which he and Marie Stringfellow discussed with Plaintiff, demanding her compliance with KSC procedures and rules.  (Id. at ¶¶11, 13).  Kirby stated that his son, David Kirby, complained to him about Plaintiff's work performance and wanted to ensure that the deficiencies would be addressed. (Id. at ¶12).  Kirby talked with Plaintiff about her work deficiencies on one occasion and she became upset; he advised her that he was sorry she was upset but that she would have to do better and then gently kissed her on the top of the head, in the presence of David Kirby and Marie Stringfellow, with the purpose of the kiss to show affection as support for Plaintiff.  (J.Kirby Aff. at ¶13).  Kirby stated that he told Plaintiff that he did not believe that she needed to take birth control, recalling that she had mentioned she was, as "fatherly advice."  (Id. at ¶14).  Kirby stated that after Plaintiff resigned on February 7, 2007, he called Plaintiff on February 8, 2007, to inquire about the reason for her separation; she was very short and told him that she did not want to discuss anything.  (Id. at ¶17).

16

II.    **Analysis**

A.    **Applicable Law**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[2] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations

---

[2] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).

omitted).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  <u>Lofton v. Secretary of Dep't of Children & Family Serv.</u>, 358 F.3d 804, 809 (11th Cir. 2004), <u>cert. den.</u>, 534 U.S. 1081 (2005).

**B.    Discussion**

As detailed *supra*, Plaintiff alleges that Kirby subjected her to unwelcome and inappropriate physical contact and comments while she was employed with KSC.  In the Complaint, Plaintiff asserts four causes of action against Defendant Kirby and KSC: Title VII/Sex Discrimination and Harassment (Count I); Retaliation (Count II); Assault and Battery (Count III); and Invasion of Privacy (Count IV).

**1.    Individual Liability under Title VII**

At the outset, individual Defendant John Kirby cannot be liable under Title VII.  As noted in <u>Wallace v. UAW Local 1639</u>, Slip Copy, 2006 WL 3834272, *2 (S.D. Ala. Dec. 22, 2006):

> The law on this point is crystal clear. Earlier this year, the Eleventh Circuit "expressly [held] that relief under Title VII is available only against the employer and not against individual employees whose actions would constitute a violation of the Act." <u>Dearth v. Collins</u>, 441 F.3d 931, 933 (11th Cir.2006); <u>see</u> <u>also</u> <u>Hinson v. Clinch County Bd. of Educ.</u>, 231 F.3d 821, 827 (11th Cir.2000) (explaining that Title VII relief is against the employer, not individual employees); <u>Busby v. City of Orlando</u>, 931 F.2d 764, 772 (11th Cir.1991) (determining that individual capacity suits under Title VII are not cognizable, as a matter of law). To the extent that Wallace would attempt to circumvent this line of authority using the alter ego doctrine, the <u>Dearth</u> decision forecloses such an argument by concluding "that the alter ego doctrine does not create an exception to the rule against individual employee liability in Title VII cases." <u>Dearth</u>, 441 F.3d at 934. There is no wiggle room here . . . .

See <u>also</u> e.g., <u>Wiley v. Treadwell Honda</u>, Slip Copy, 2009 WL 577729, *2 (S.D. Ala. Mar. 5, 2009).[3]

---

[3]  <u>Cf</u>. <u>Moss v. W & A Cleaners</u>, 111 F. Supp. 2d 1181, n.9 (M.D. Ala. 2000).

Thus, summary judgment is **GRANTED** as to the Title VII claims asserted against individual Defendant John Kirby because the claims are not sustainable as a matter of law.

### 2.    Count II (Retaliation)

Plaintiff concedes that Count II is "due to be dismissed and was included in the Plaintiff's Complaint in error." (Doc. 41 at 2). As such, given Plaintiff's concession, summary judgment is **GRANTED** in favor of Defendants as to Count II (Retaliation) of Plaintiff's Complaint.

### 3.    Count I (Title VII Sex Discrimination/Harassment)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against discrimination based on sex encompasses sexual harassment. See, e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc); Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995). Generally sexual harassment comes in two forms: harassment that results in a tangible employment action and hostile work environment harassment. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 508 (11th Cir. 2000).

To prove sexual harassment under Title VII in the Eleventh Circuit, a plaintiff must show that: 1) she is a member of a protected group; 2) she was subjected to unwelcome sexual harassment; 3) the harassment was based on her sex; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) there is a basis for employer liability. Johnson, 234 F.3d at 508; Mendoza, 195 F.3d at 1245. See also Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1300 (11th Cir. 2007); Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).

19

a.     Harassment Based on Gender

To state an actionable Title VII case, plaintiff must establish that the alleged conduct was based on her sex.  See, e.g., Blue Cross/Blue Shield, 480 F.2d 1287.  "[T]here may be cases when a supervisor makes sexual overtures to workers of both sexes or where the conduct complained of is equally offensive to male and female workers[] . . . .[i]n such cases, the sexual harassment would not be based upon sex because men and women are accorded like treatment."  Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982).  See also Fitzpatrick v. Winn-Dixie Montgomery, Inc., 153 F. Supp. 2d 1303, 1305-1306 (M.D. Ala. 2001).[4]

Defendant argues that the alleged harassing contacts by John Kirby, i.e. hugging and kissing, were not based on Plaintiff's gender, but rather were commonplace to both male and females and were merely non-sexual affectionate gestures.  In support the Defendant has submitted affidavits from former co-workers of Plaintiff which assert that Kirby was equally affectionate to both male and female employees at KSC.  See supra Section I.C. These affidavits indicate that Kirby treated his staff like family and would often hug them, rub their shoulders, kiss them and/or put his arm around them, and that these actions were directed toward all of his employees regardless of gender. Additionally, these former co-workers stated that they did not believe that Kirby's actions towards them were inappropriate and/or sexual in nature.

_____

[4]  As noted in Fitzpatrick, 153 F. Supp. 2d 1303:

Where a supervisor makes sexual overtures to employees of both genders, or where the conduct is equally offensive to male and female workers, the conduct may be actionable under state law, but it is not actionable as harassment under Title VII because men and women are accorded like treatment. Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982); see also Oncale v. Sundowner Offshore Services, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(stating that under Title VII the issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed).

Plaintiff responds that John Kirby's repetitive instances of touching her were inherently sexual in nature, especially in light of the verbal comments which often accompanied the physical contact. Plaintiff has testified that Kirby not only hugged and kissed her and rubbed her shoulders, but that Kirby made certain repetitive comments, comments which do not appear to have been made to any other of her former co-workers. Specifically, Plaintiff testified that Kirby stated that if he were younger he would call her all the time, take her out and wear her out, that she was a pretty girl, that when he was younger he was in fabulous shape, that he did not want her to be on birth control, that she was lucky to have her job and that they would need to find a way to get along. In contrast, Plaintiff's former male and female co-workers simply stated that Kirby talked with them about personal issues or problems and often gave them advice, as well as moral and spiritual support; in essence, that he gave them fatherly advice. (C.Kirby Aff. at ¶¶ 9-10; Gregg Aff. at ¶¶4-5; Palladino Aff. at ¶¶4-5; D.Kirby at ¶14; Crider Aff. at ¶¶8-9; R.W.Bates Aff. at ¶¶4-6). As such, resolving all inferences in favor of Plaintiff and taking all of her allegations as true, Plaintiff has established a genuine issue of material fact as to whether the physical contact initiated by John Kirby was because of Plaintiff's sex.

b.    <u>Severe and Pervasive</u>

Defendant also challenges Plaintiff's ability to show that the claimed harassing behavior of John Kirby was severe and pervasive. Plaintiff responds that the incidents alleged (hugging, kissing, touching <u>and</u> inappropriate statements by John Kirby) "even if by themselves were not severe enough to alter the terms and conditions of her employment, [together] constituted a pattern of verbal harassment and touching that, viewed in its entirety, is sufficiently pervasive[.]" (Doc. 41 at 5-6).

21

To determine whether any alleged conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment, courts assess 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with the employee's job performance.  See, e.g., Mendoza, 195 F.3d at 1246.  Analysis of these factors involves a subjective and objective component requiring the Court to review "all the circumstances" to determine if a hostile work environment exists.  Id.  See also Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  "[I]n order to be actionable . . . a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  The existence of sexual harassment must be determined in light of the record as a whole and "the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 69 (1986).  See also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

There is certainly sufficient evidence, if believed by a jury, that Plaintiff subjectively perceived John Kirby's behavior during the five months in which she was employed at KSC as harassing.  Plaintiff testified that Kirby hugged, touched and kissed her, as well as made comments to her that she felt were inappropriate, and moreover during her five months of employment, she let Kirby know that his actions made her feel uncomfortable by "shrugging him off" or to "wiggle off or step back [away from him] or make noises like a sigh or just get a rude attitude[,]" occasionally "give him a dirty look" and/or acting "real short with him."  (Plf's Dep. at 53-54, 66, 86).  Plaintiff testified that on several of the occasions when she "shrugged him off," in response, Kirby told her

22

"we don't have to like each other but we're going to have to get along somehow[]" and that "I'm lucky to have my job[] and other people weren't as fortunate," and that Kirby's comments to her made her feel threatened.  (Id. at 68, 84-87, 129).  Plaintiff told KSC management member Melissa Gaylord that she "hated her job" and "wanted to leave" and that she "did not like Kirby hugging her." (Plf's Dep. at 87-92; Gaylord Aff. at ¶¶8-9).[5]  Plaintiff testified that she told Curtis Gregg, the KSC Production Manager, that she "hated the way it was" and that Kirby made her "uncomfortable;"  (Plf's Dep. at 95-96).  Plaintiff testified that she told Curtis Gregg, Melissa Gaylord and Byron White about being unhappy at work, that she hated Kirby being "around her and on her and touching her" and that she "wished Kirby would leave her alone."  (Id. at 87-92, 95-96).  Plaintiff testified that she resigned and "was humiliated" and "hoped to leave with some dignity." (Id. at 140).  Plaintiff also testified that she did not consider giving two weeks notice to KSC because she "could not stand the work environment."  (Id. at 111-112).

As to the objective component, the Court's review of all of the circumstances – taking Plaintiff's allegations in the light most favorable to Plaintiff – supports the existence of a genuine issue of material fact.  Kirby's alleged conduct was not infrequent.  In addition to physically hugging Plaintiff on a daily basis, Kirby allegedly made repetitive comments to her that she was pretty girl (between five and ten times); that "if he were younger" (about five times) he would call her all the time and take her out and buy her whatever she wanted and that he would wear her out; that he did not want her to be on birth control; that she was lucky to have her job (at least five times); and that

---

[5] Plaintiff testified that she felt that Kirby was also inappropriate with Melissa Gaylord, with "the hugs and kisses, the same stuff, but just not quite as bad."  (Plf's Dep. at 108-109).

they would have to learn to get along.[6]  Kirby also allegedly rubbed Plaintiff's shoulders from behind "a few times" (while telling her that she was lucky to have her job because others were not as fortunate), poked Plaintiff in the stomach once and kissed Plaintiff more than five times on the head, as well as partially on her face on one occasion.

In sum, the Defendant has submitted evidence that if believed by the jury could result in a defense verdict because it tends to show that Kirby's conduct was merely affectionate gestures and not sexually inappropriate.  However, Plaintiff has submitted evidence, that if believed by a jury, would refute the Defendant's contention that the behavior was non-sexual in nature.  Therein is the reason that summary judgment on the Title VII claim is inappropriate.  Taking Plaintiff's allegations in the light most favorable to Plaintiff, Plaintiff has established a genuine issue of material fact precluding summary judgment on her Title VII claims.  See, e.g., Johnson, 234 F.3d at 508-509 (finding that 15 instances of harassment over four months which included unwelcomed massages, sexual comments, a kiss, and questions about plaintiff's sex life, were sufficiently severe and pervasive to constitute sexual harassment).

c.    Employer Liability

The last element of Plaintiff's proof requires a basis for employer liability.   Defendant argues that Plaintiff is unable to establish a basis for employer liability.  In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the United States Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment."  Faragher, 524 U.S. at 807-808; Ellerth, 524 U.S. at 762-763.  Even where no

---

[6]  Plaintiff also testified about Kirby commenting about breasts (one time), but she testified that she did not find that comment to be offensive or inappropriate.

tangible employment action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 745.  However, there are instances where an employer may avoid vicarious liability by showing that it exercised reasonable care to prevent and correct promptly any sexual harassing behavior, and that the employee being harassed unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 807-809.  This is known as the Faragher/Ellerth defense.

In this case, Defendant KSC cannot avail itself of the Faragher/Ellerth defense because there is no dispute that the alleged harasser, John Kirby, is the President and CEO of KSC, and is thus a proxy of the employer.  As summarized in Ackel v. National Communications, Inc., 339 F.3d 376, 383 (5th Cir. 2003), "the employer is vicariously liable for its employees activities in two types of situations: (1) there is a tangible employment action or (2) the harassing employee is a proxy for the employer."  As the Seventh Circuit explained in Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000):

> In Ellerth and Faragher, the Supreme Court considered an employer's vicarious liability for the sexually harassing conduct of its supervisory staff. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." Ellerth, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; Faragher, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662. Vicarious liability automatically applies when the harassing supervisor is either (1) *"indisputably within that class of an employer organization's officials who may be treated as the organization's proxy,"* Faragher, 524 U.S. at 789, 118 S.Ct. 2275, 141 L.Ed.2d 662, or (2) "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Id. at 808, 118 S.Ct. 2275. Absent either of these situations, however, an employer may avoid vicarious liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

_Ellerth_, 524 U.S. at 765, 118 S.Ct. 2257.

_Johnson_, 218 F.3d at 730 (emphasis added).  Thus, it does not matter whether there was a tangible employment action or whether this is a case based solely on alleged hostile environment harassment; in either scenario Defendant KSC cannot assert the _Faragher_/_Ellerth_ defense because John Kirby is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy."  _See supra_.  _See_ _also_ _Kimsey v. Akstein_, 408 F. Supp. 2d 1281, 1299-1301 (N.D. Ga. 2005) (finding that the alleged harasser was the CEO and President of the company, thus the employer could not avail itself of the _Faragher_/_Ellerth_ defense).

> **4.** **State Law Claims**

> a.   Invasion of Privacy

Under Alabama law, there are four wrongs that can constitute invasion of privacy: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) giving publicity to private information about the plaintiff which violates ordinary decency; 3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and 4) appropriating some element of the plaintiff's personality for commercial use.  _See_, _e.g._, _Edwards v. Hyundai Motor Mfg. Alabama, LLC_, 2009 WL 807452, *13 (M.D. Ala. Mar. 27, 2009); _Beasley v. Wal-Mart Stores East, L.P._, 2006 WL 3333069, *5-6 (S.D. Ala. Nov. 16, 2006); _Cash v. Smith_, 231 F.3d 1301, 1308 (11th Cir. 2000); _Phillips v. Smalley Maintenance Servs., Inc_., 435 So.2d 705, 708 (Ala. 1983).  While there is no separate cause of action for sexual harassment under Alabama law, the Alabama Supreme Court has held that severe sexual harassment can be an invasion of privacy.  _See_, _e.g._, _Armstrong v. Standard Furniture_, 197 Fed. Appx. 830, 833-834 (11th Cir. Aug. 30, 2006) (unpublished) (citing _Busby v. Truswal Sys. Corp._, 551 So.2d 322, 324 (Ala. 1989)).  One may invade another's privacy

through either an intrusion upon a physical space or by an invasion of one's "emotional sanctum." <u>Phillips</u>, 435 So.2d at 711 (stating that "[o]ne's emotional sanctum is certainly due the same expectations of privacy as one's physical environment[]").

In the Complaint, Plaintiff bases her invasion of privacy claim not on any form of intrusion upon her physical solitude or seclusion, but instead, narrowly, on a very specific intrusion or invasion of her "emotional sanctum:"

> 41.   Defendant Kirby acts of making **comments regarding the Plaintiff's body** were an invasion of her privacy.

> 42.   Defendant Spectrum condoned and ratified the actions of Defendant Kirby by failing to take remedial action when it was aware of the **sexual comments** made by Defendant Kirby.

(Doc. 1 at 6 (emphasis added)).  Accordingly, Plaintiff's invasion of privacy claim is rooted entirely upon Defendant Kirby's alleged sexual comments regarding Plaintiff's body.

Taking Plaintiffs' allegations as true, the "sexual comments regarding her body" fail to rise to the level of invasion of privacy.  The offensive comments allegedly made by John Kirby and recounted above simply are not severe enough.  <u>See, e.g.</u>, <u>Beasley</u>, 2006 WL 3333069, *7 (holding that there was no invasion of privacy where defendant offered to teach plaintiff how to play strip poker, made a comment that she liked nuts which she interpreted to mean "men's nuts" and in front of several co-workers asked her if she had a boyfriend which she perceived to be a precursor to asking her for a date).  Notably, the Alabama Supreme Court has even held that asking a co-employee for a date in combination with making sexual propositions does not constitute an invasion of privacy.  <u>McIsaac v. WZEW-FM Corp.</u>, 495 So.2d 649 (Ala. 1986) (concluding that there was insufficient evidence to constitute a claim of invasion of privacy where the president of the company told a female employee about an affair that he had, asked the employee to have dinner

and to be available when he was in town, tried to kiss the employee, engaged in lurks or innuendoes, touched her arm and tried to have her to fired).  Because Plaintiff has not alleged anything other than these specific comments as the basis for her invasion of privacy claim, Defendants' motion for summary judgment, with regard to this claim, is **GRANTED.**

      b.    <u>Assault and Battery</u>

In the Complaint, Plaintiff alleges that Defendant John Kirby committed assault and battery insofar as:

> 35.    Defendant Kirby committed several assaults and batteries upon the Plaintiff by touching or attempting to touch her in a rude, offensive, lewd and abusive manner.

> 36.    Defendant Spectrum condoned and ratified the actions of Defendant Kirby by failing to take remedial action when it was aware of the untoward advances made by Defendant Kirby.

(Doc. 1 at 6).

In an assault-and-battery action a plaintiff must prove that: 1) that the defendant touched the plaintiff; 2) the defendant intended to touch the plaintiff; and 3) the touching was conducted in a harmful or offensive manner.  <u>See</u>, <u>e.g.</u>, <u>Armstrong</u>, 197 Fed. Appx. at 834; <u>Harper v. Winston County</u>, 892 So.2d 346, 353 (Ala. 2004).  "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." <u>Wright v. Wright</u>, 654 So.2d 542, 544 (Ala. 1995) (citing <u>Surrency v. Harbison</u>, 489 So.2d 1097 (Ala. 1986) and <u>Singer Sewing Machine Co. v. Methvin</u>, 63 So. 997 (1913)).  A key element of the tort of battery is that "the touching was conducted in a harmful or offensive manner." <u>Ex parte Atmore Community Hosp</u>., 719 So.2d 1190, 1194 (Ala. 1998).  The Alabama Supreme Court noted that, in order to establish that the defendant committed a battery, there must be substantial evidence that the alleged touching occurred with

sexual overtones and was unwelcome.  (Id.).  Plaintiff testified that Defendant Kirby hugged her at work, kissed her at work, rubbed her shoulders at work, and poked her in the stomach once at work, and that she considered this touching to be unwelcome.  Although there is contradictory evidence in the record, see supra, on summary judgment the Court will not make credibility determinations. Accordingly, Plaintiff has created an issue of material fact as to whether Defendant Kirby committed assault-and-battery and thus, Defendants' motion for summary judgment, with regard to this claim, is **DENIED.**

**III.**   **Conclusion**

Based upon the foregoing, the Court finds that Defendants' Motion for Summary Judgment (Docs. 36, 37, 38, 40) is due to be **GRANTED** as to Count I (Title VII) against Defendant John Kirby; **GRANTED** as to Counts II (Retaliation) and IV (Invasion of Privacy) against all Defendants; **DENIED** as to Count I (Title VII) against Defendant KSC; and **DENIED** as to Count III (Assault and Battery).

**DONE** and **ORDERED** this the **7th** day of **May 2009.**

/s/ Kristi K. DuBose_____
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**